# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JODDIE GILBERTSON,                        Civ. No. 09-1824 (PJS/AJB)

          Plaintiff,

v.                               **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

---

## INTRODUCTION

Plaintiff Joddie Gilbertson disputes the unfavorable decision of the Commissioner of

Social Security, denying her application for supplemental security income ("SSI"). The matter is

before this Court, United States Magistrate Judge Arthur J. Boylan, for a report and

recommendation to the District Court on the parties' cross-motions for summary judgment. See

28 U.S.C. § 636(b)(1) and Local Rule 72.1. Plaintiff is represented by Mac Schneider and Joel

M. Fremstad, Esqs. Defendant is represented by Lonnie F. Bryan, Assistant United States

Attorney. This Court has jurisdiction under 42 U.S.C. § 405(g). Based on the reasoning set

forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No.

24] be denied, and Defendant's motion for summary judgment [Docket No. 27] be granted.

## PROCEDURAL HISTORY

Then, Plaintiff filed a previous application for benefits in 2003, which was denied by an

ALJ on January 3, 2005, and upheld by the Appeals Council. (Tr. 24.) Plaintiff protectively

filed an application for supplemental security income on August 16, 2005. (Tr. 124-136.)[1] She

alleges disability from fibromyalgia, migraine headaches, myofascial pain, depression, bipolar

disorder, chronic fatigue syndrome, hypothyroidism, irritable bowel syndrome, and TMJ. (Tr.

150.) Her application was denied initially and upon reconsideration. (Tr. 94-97, 100-02.)

Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held

on February 2, 2008, before Administrative Law Judge James Geyer ("ALJ"). (Tr. 99, 21-66.)

The ALJ issued an unfavorable decision on May 21, 2008. (Tr. 5-20.) On May 14, 2009, the

Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's

decision the final decision of the Commissioner. (Tr. 1-4.) See 20 C.F.R. § 416.1481. On July

14, 2009, Plaintiff sought review from this Court. The parties thereafter filed cross-motions for

summary judgment.

## PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

Plaintiff was born on February 3, 1959, and was 46-years-old on the date she filed the

application for supplemental security income. (Tr. 18.) Plaintiff's highest educational level is

two years of college, where she studied accounting. (Tr. 160, 27.) Her employment history

includes bakery manager, various food preparation, cashier, housekeeping, and secretary. (Tr.

151). Her job as bakery manager, in a bakery she co-owned with her mother, ended in 1999.

(Tr. 151, 269.)

### Primary Care Physicians

#### Dr. Scott Turner

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 20, as "Tr."

The first record of Plaintiff's treatment with Dr. Scott Turner at Red River Spine Associates is from January 6, 2004. (Tr. 397, 418.) Plaintiff had a flare-up of neck and low back pain. (Tr. 418.) On examination, Plaintiff had muscle tightness and decreased range of motion of the cervical and lumbar spine, which was treated with strain/counterstrain release, facilitated positional release of the cervical spine, and muscle energy release. (Id.) Dr. Turner diagnosed somatic dysfunctions of the cervical spine and pelvis, myofascial pain, and headache disorder as documented in previous history. (Id.) Dr. Turner continued to treat Plaintiff for similar symptoms, and with similar clinical findings approximately every two to four weeks. (Tr. 398-417.) Plaintiff also complained to Dr. Turner of other symptoms including fatigue, sore arms, legs, and feet, constipation, migraines, trouble sleeping, brain fog, forgetfulness, and depression. (Tr. 410, 412.) During a number of examinations, Dr. Turner observed Plaintiff having trigger point tenderness. (Tr. 399-402, 404, 410, 412, 415-16.)

On August 19, 2004, Plaintiff had a thyroid test, and the results were in the low normal range. (Tr. 410.) Dr. Turner recommended a thyroid protocol. (Id.) In March 2005, Plaintiff had been weaned off Cytomel after it apparently caused her to lose a lot of weight. (Tr. 405.) She reported she was aching all over, and her hands and feet were cold. (Id.)

Plaintiff next saw Dr. Turner on May 23, 2005, and reported that she was aching all over, and her attempt to go back to work part-time led to migraines, which lasted two or three days. (Tr. 403.) Plaintiff's sleep was improving, so she was directed to wean off Trazadone. (Id.) In July, Plaintiff complained of neck and low back pain, with spasms in the low back. (Tr. 402.) She was also having weekly headaches that could last for days. (Id.)

After Plaintiff filed her SSI application on August 16, 2005, Dr. Turner completed a

Fibromyalgia Medical Evaluation Form for Plaintiff. (Tr. 299-306.) He indicated Plaintiff's impairments were constant neck, mid back, and low back pain, and that she met the American Rheumatological criteria for fibromyalgia. (Tr. 299.) Dr. Turner listed Plaintiff's symptoms as non-restorative sleep, chronic fatigue, cognitive impairment, myofascial pain, numbness, tingling and multiple trigger points. (Tr. 300.) He noted that Plaintiff's pain was constant, but could be rated mild to severe, and her pain would frequently interfere with her attention and concentration. (Tr. 301-02.) He also indicated that Plaintiff was not a malingerer, but emotional factors contributed to the severity of her symptoms. (Tr. 301.) He opined that Plaintiff would be severely limited in her ability to deal with work stress. (Tr. 302.) Dr. Turner opined Plaintiff could sit for four hours, and stand or walk less than two hours at a time, and that she would need to lie down at unpredictable times during a work shift. (Tr. 303.) He restricted Plaintiff to lifting up to twenty pounds occasionally, and opined that she would be expected to miss work more than three days a month from her impairments. (Tr. 304-05.)

When Plaintiff saw Dr. Turner at the end of October 2005, she reported back pain with bending, and increased discomfort when twisting or climbing up and down a ladder. (Tr. 398.) Dr. Turner diagnosed somatic dysfunctions of the cervical spine, pelvis and sacrum, myofascial pain/fibromyalgia, headache disorder, and pain syndrome. (Id.)

### Dr. Richard Rohla

On March 9, 2004, Plaintiff saw her primary care physician, Dr. Richard Rohla, at Dakota Clinic. (Tr. 365-66.) She was very frustrated with her chronic fibromyalgia pain. (Tr. 365.) The next month, Dr. Rohla reviewed Plaintiff's recent medical history. (Tr. 361-62.) He noted Plaintiff had recently started treatment for allergies, and she was under the care of Dr.

Turner for chronic back problems.  (Tr. 361.)  He also noted Plaintiff had recently seen a psychiatrist who diagnosed her with bipolar disorder.  (Id.)  Plaintiff complained to Dr. Rohla of feeling helpless, hopeless, and having no energy or ambition.  (Id.)  Dr. Rohla recommended that Plaintiff see her psychiatrist for medication.  (Tr. 362.)  Plaintiff also complained of left hand and wrist pain, and examination confirmed carpal tunnel syndrome.  (Id.)  Plaintiff was given a wrist splint.  (Id.)  Plaintiff was also feeling miserable from fibromyalgia pain.  (Id.)  Dr. Rohla refilled her prescription for hydrocodone, but wanted to taper her off Oxycontin as soon as possible.  (Id.)

Later that month, Plaintiff saw Dr. Rohla and complained of headache, sinus pain, general malaise and fatigue.  (Tr. 359-60.)  Her range of motion of the extremities was good, although she complained of muscle aches.  (Tr. 359.)  Plaintiff was treated for allergic rhinitis.  (Id.)

On July 12, 2004, Plaintiff saw Dr. Rohla and complained of daily headaches and severe migraines once or twice a week.  (Tr. 355.)  Her jaw and face hurt, and her neck, shoulders, and back were always knotted up.  (Id.)  Plaintiff did not have a headache at the time of examination.  (Id.)  She had some sinus drainage and fibromyalgia trigger points.  (Tr. 355-56.)  Dr. Rohla treated Plaintiff with Kenalog and Clarinex.  (Tr. 356.)

On August 2, 2004, Plaintiff saw Dr. Rohla for severe headaches.  (Tr. 353.)  She also complained of worsening allergy symptoms after cleaning out a moldy fish house.  (Id.)  Dr. Rohla's assessment was chronic serous otitis, chronic mastoid inflammation, sinus pain with lymphadenitis and allergic rhinitis.  (Id.)  Dr. Rohla recommended Clarinex and a nasal spray.  (Id.)

Plaintiff saw Dr. Rohla again on August 17, 2004, for multiple symptoms including headache, joint complaints, neck pain, back pain, eye burning, sore hands and wrists, generalized malaise and fatigue, runny nose, itchy eyes, and sinus drainage. (Tr. 351.) Dr. Rohla's assessment was fibromyalgia with allergic rhinitis or sinusitis. (Id.) He noted that Plaintiff complained bitterly of pain disabling her from performing her activities of daily living, and he recommended that Plaintiff continue to use Demerol and hydrocodone for pain. (Id.) Later that month, a CT scan of Plaintiff's head was normal. (Tr. 380.)

On November 1, 2004, Plaintiff saw Dr. Rohla for chronic fibromyalgia and fibromyositis pain. (Tr. 349.) Plaintiff complained of numbness on the top of her head and pain in her right leg. (Id.) Dr. Rohla referred Plaintiff to a neurologist, and treated her with Toradol and Diflucan. (Tr. 349-50.)

Plaintiff next saw Dr. Rohla on March 28, 2005. (Tr. 327.) On examination, Plaintiff had typical trigger points of fibromyalgia and complaints of pain and malaise. (Id.) Plaintiff followed up with Dr. Rohla regarding her fibromyalgia on May 23, 2005. (Tr. 317.) Plaintiff reported that she continued to work part-time and struggled with pain. (Id.)

When Plaintiff saw Dr. Rohla on August 18, 2005, just after she filed her SSI application, she complained of headache, muscle aches, and multiple trigger points of pain. (Tr. 313.) Plaintiff indicated, however, that her mood was improved. (Id.) A week later, Dr. Rohla completed a Fibromyalgia Medical Evaluation Form for Plaintiff. (Tr. 291-98.) Dr. Rohla listed Plaintiff's impairments as back, neck and shoulder pain, trigger points throughout the body, irritable bowel syndrome, TMJ, chronic fatigue syndrome, myofascial pain, hypothyroid, depression, daily tension headaches, and migraines. (Tr. 291.) He stated that Plaintiff met the

American Rheumatological criteria for fibromyalgia, and her impairments would be expected to last at least twelve months. (Tr. 291-92.) He indicated that many factors precipitated Plaintiff's pain, emotional factors contributed to the severity of her symptoms, and she was not a malingerer. (Tr. 293.) Dr. Rohla indicated that Plaintiff's pain frequently would interfere with her attention and concentration, and her ability to deal with work stress was markedly limited. (Tr. 294.)

Dr. Rohla opined that Plaintiff was taking too many medications for pain and was "drugged up," and she described herself as "spaced out" with slow reaction times. (Id.) He noted Plaintiff complained of side effects of dizziness, tiredness, chronic stomach upset, and trouble with motivation. (Id.) Dr. Rohla opined that Plaintiff was unable to work due to lack of concentration, anxiety, moderate pain and fatigue. (Id.) He indicated that she could sit, stand or walk for less than two hours at a time, would need to lie down at unpredictable intervals during a work shift, and could only occasionally lift less than ten pounds. (Tr. 295-96.) He further indicated Plaintiff would be absent from work more than three times a month due to her impairments. (Tr. 297.) With respect to Plaintiff's ability to work at a regular job on a sustained basis, Dr. Rohla stated:

> migraines would interfere, depression and anxiety adds to the
> inability to concentrate or follow directions. Pain prevents pt. to
> be at work and function fully. Pt. tired all the time and weak. Pt.
> c/o chronic pain of hands, legs, arms, neck, back & shoulders.

(Id.)

Plaintiff next saw Dr. Rohla on September 20, 2005, and reported that her fibromyalgia was slightly improved, but she was concerned about lack of energy and depression, with her mood being much worse. (Tr. 308.) Plaintiff was taking Wellbutrin and Serafam, and Dr. Rohla

was hesitant to add more medication.  (Id.)  He recommended counseling, and Plaintiff agreed. (Id.)

On December 19, 2005, Plaintiff saw Dr. Rohla for a grief reaction after her brother died in an accident.  (Tr. 486-87.)  Dr. Rohla also noted that Plaintiff was having hip and back pain, but her fibromyalgia was under reasonable control, and she had only one migraine in the last several weeks.  (Tr. 486.)  Plaintiff saw Dr. Rohla for palpitations and shortness of breath in March 2006.  (Tr. 478-79.)  She next saw Dr. Rohla for pain in her left arm and shoulder on May 10, 2006.  (Tr. 474-75.)  X-rays indicated evidence of subacromial impingement.  (Tr. 472.) Plaintiff was treated with an injection of Marcaine, Xylocaine and Celestone.  (Id.)

Plaintiff submitted additional medical records to the SSA at her hearing, including a Treating Physician Medical Opinion Statement form from Dr. Rohla, dated January 16, 2008. (Tr. 525-31.)  On this form, Dr. Rohla indicated Plaintiff's diagnoses were fibromyalgia, fibromyositis, chronic pain syndrome, severe peripheral neuropathy, headaches, migraines, depression, mood disturbance, and anxiety.  (Tr. 525.)  Dr. Rohla indicated Plaintiff's limitations would be as follows: frequently lift and carry less than ten pounds; stand or walk less than two hours in an eight-hour workday; sit less than six hours in an eight-hour workday; periodically lay down; limited pushing and pulling in upper and lower extremities; driving restricted by pain; can never crouch or crawl; can occasionally climb, balance, kneel, or stoop; occasional reaching, handling and fingering; vision sometimes limited by headaches; environmental limitations from allergies; mental impairments of depression and anxiety cause marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. (Tr. 525-30.)  Dr. Rohla stated, "[t]his patient has a longstanding problem with fibromyalgia and

fibromyositis with an associated chronic pain syndrome.  She also has a history of chronic

depression secondary to her chronic health issues and chronic fatigue."  (Tr. 531.)

**Other Medical Treatment**

In January and February 2005, Plaintiff underwent several evaluations, including testing

for cancer, to discover the cause of chronic weight loss and other intermittent symptoms.  (Tr.

335, 339-44, 377.)  Dr. Ruth Sampson at Dakota Clinic noted that Plaintiff had been taking

approximately four times the normal replacement dose of Cytomel, which almost certainly

caused her symptoms.  (Tr. 340-41.)  Dr. Sampson expected the symptoms to resolve in the next

month because Plaintiff stopped taking Cytomel.  (Tr. 341.)

On July 21, 2005, Plaintiff went to the emergency room at Hillsboro Medical Center for

treatment of left low back pain radiating down her left leg.  (Tr. 289.)  Plaintiff reported she had

twisted her back the previous night when she was lifting boxes.  (Id.)  Plaintiff had taken

Darvocet, Flexeril, and Clonazepam with little relief.  (Id.)  Plaintiff was diagnosed with left low

back strain and treated with Toradol.  (Tr. 289-90.)

On January 5, 2006, Plaintiff saw Dr. Charles Breen at MeritCare Clinic Hillsboro

for pain on the right side, involving her hip, leg, knee and lower back.  (Tr. 457-59.)  Plaintiff

also reported that she felt burning in her right foot and right thigh.  (Tr. 457.)  Her pain had been

increasing for several weeks.  (Id.)  On examination, Plaintiff had some soft tissue atrophy in her

low back, where she had received cortisone injections.  (Tr. 458.)  She had good range of motion

of the right hip, but diminished deep tendon reflexes in both knees, and diminished ankle jerk

reflexes.  (Tr. 458.)  Dr. Breen ordered an MRI of Plaintiff's lumbar spine, which indicated areas

of degenerative changes without evidence of significant central canal or neural foraminal

narrowing.  (Tr. 459, 462.)

Plaintiff saw Physician Assistant ("PA") Ann Owens at MeritCare Clinic Hillsboro on June 8, 2006.  (Tr. 454-56.)  Plaintiff complained of a migraine headache, which had begun the previous day, and was not relieved with Demerol, Darvocet or Amerge.  (Tr. 455.)  PA Owens noted that Plaintiff had not had a migraine "for some time," and usually Plaintiff's migraines were relieved by taking Amerge.  (Id.)  Plaintiff reported that stress was a major trigger for her migraines.  (Id.)  On examination, Plaintiff was in obvious distress.  (Tr. 456.)  She was treated with Phenergan and Toradol.  (Id.)

**Medical Treatment by Specialists**

**Dr. George Kroker**

Dr. Rohla referred Plaintiff to Dr. George Kroker at Allergy Associates of LaCrosse, who evaluated Plaintiff on March 16, 2004.  (Tr. 269.)  Dr. Kroker noted Plaintiff's medical history of being diagnosed with fibromyalgia in 1987, for which she was taking hydrocodone.  (Id.)

Dr. Kroker noted Plaintiff had worked in a bakery from 1996 through 1999.  (Id.)  She then had a serious fibromyalgia flare-up in August 1999, and had not successfully worked since then, having quit a job as a census taker and food manufacturer due to aching, headaches and "other distress."  (Id.)  Plaintiff's examination was remarkable for peri-orbital shiners, nasal turbinate congestion, coated tongue, fibromyalgia trigger points in the upper back and shoulders, and positive Tinnel's sign in the left wrist, suggestive of carpal tunnel syndrome.  (Id.)

Dr. Kroker diagnosed Plaintiff with:  1) candida hypersensitivity; 2) probable multiple food sensitivities; 3) magnesium deficiency; and 4) inhalant sensitivities.  (Tr. 268-69.)  Dr. Kroker opined that these problems contributed to Plaintiff's fibromyalgia, migraine headaches,

constipation, fatigue, and sinus congestion. (Tr. 268.)

Plaintiff saw Dr. Kroker again on October 28, 2004, and reported that her sinus headaches were worse over the last months. (Tr. 265.) Plaintiff also reported that she had some energy improvement on Diflucan. (Id.) Plaintiff complained of other environmental sensitivities causing headaches, and Dr. Kroker began chemical desensitization treatment. (Id.) He also recommended ongoing immunotherapy. (Id.)

Plaintiff saw Dr. Kroker in follow-up on March 4, 2005. (Tr. 263.) Dr. Kroker noted that since Plaintiff's last visit in October 2004, she started taking propanolol[2] with some reduction in her migraine headaches. (Id.) He also noted that Plaintiff had been on Cytomel, but it was discontinued because she was thought to have iatrogenic hyperthyroidism. (Id.) Plaintiff reported more "fibromyalgia tendencies" since being off Cytomel. (Id.)

Dr. Kroker explained to Plaintiff that many patients with fibromyalgia improved on a small dose of thyroid medication. (Id.) He recommended a low dose of long-acting Cytomel. (Id.) Plaintiff saw Dr. Kroker on an emergency basis several days later, complaining of extreme pain in the back of her neck, which was not relieved with Darvocet, Amerge, and Demerol. (Tr. 262.) Dr. Kroker gave Plaintiff Flexeril, which had been effective for her for muscle spasms in the past. (Id.) He also prescribed Flonase and Levaquin, and gave Plaintiff a letter concerning her perfume sensitivity. (Id.)

### Dr. David Fitzgerald

Plaintiff saw a neurologist, Dr. David Fitzgerald, to evaluate and treat her headaches. On

_____

[2]      Propanolol is the generic form of Inderal and is indicated for the prophylaxis of migraine headaches. Physician's Desk Reference ("PDR") 3336 (59th ed. 2005).

September 21, 2004, Plaintiff reported worsening allergies and a migraine lasting one and a half months. (Tr. 348.) Plaintiff also reported being under a lot of stress, but was vague about what was causing the stress. (Id.) Dr. Fitzgerald asked Plaintiff to discontinue hydrocodone and begin taking propanolol for her daily headaches. (Tr. 347.) He opined that if she continued to use short acting narcotic analgesics, she would not get rid of her daily headaches. (Id.)

On October 18, 2004, Plaintiff reported that her headaches were improving with taking Inderal. (Tr. 407.) About six weeks later, Dr. Fitzgerald noted when he last saw Plaintiff she was having a problem with daily Vicoprofen use. (Tr. 346.) The Inderal had decreased her headaches, but she was still taking Vicoprofen two or three days per week. (Id.)

Plaintiff next saw Dr. Fitzgerald on March 28, 2005. (Tr. 326.) Dr. Fitzgerald noted that Plaintiff's migraine headaches had decreased somewhat since she started taking Inderal. (Id.) He also noted Plaintiff still had breakthrough migraines, for which she took Amerge, and for other headaches, she took Demerol or Darvocet. (Id.) Dr. Fitzgerald noted that analgesic overuse had been a problem for Plaintiff in the past. (Id.) He recommended increasing Plaintiff's Inderal, but cutting back on her Trazadone because her energy in the morning had improved. (Id.)

Plaintiff saw Dr. Fitzgerald for follow up on her headaches on October 26, 2005. (Tr. 490-91.) Dr. Fitzgerald noted Plaintiff was feeling considerably better since starting thyroid supplementation. (Tr. 490.) He recommended that Plaintiff continue Topamax and Inderal daily, and Amerge as needed. (Id.) He noted he would consider tapering or discontinuing Topamax or Inderal if Plaintiff was headache-free for several months. (Id.)

**Dr. Joseph Sleckman**

Plaintiff saw Dr. Joseph Sleckman in consultation for fibromyalgia at the Dakota Rheumatology Clinic on March 10, 2005.  (Tr. 329-31.)  Dr. Sleckman reviewed Plaintiff's history. (Tr. 329.)  Plaintiff ached in her muscles going back to when she was very young.  (Id.)  Plaintiff was diagnosed with toxoplasmosis in 1976.  (Id.)  She later had three children.  (Id.)  Plaintiff reported the following symptoms:  daily tension headaches that sometimes triggered migraine headache; two surgeries for TMJ; chronic constipation; difficulty with cold hands and feet, and difficulty with her hands shaking, causing her to drop things; significant fatigue, and depression.  (Id.)

On examination, Plaintiff had no synovitis in the upper extremities.  (Tr. 330.)  She had mild pain with movement of the hips.  (Id.)  Plaintiff had tenderness and spasm in the neck, trapezius muscles, supraspinatus muscles and over the superior gluteal folds.  (Id.)  Dr. Sleckman gave Plaintiff injections in her tender areas of muscle spasm.  (Tr. 331.)  He prescribed a trial of cyclobenzaprine[3] for sleep, and prescribed ultrasound and massage once a week for two months.  (Id.)  Dr. Sleckman diagnosed fibromyalgia, possible mild osteoarthritis of the left hip, depression, and history of toxoplasmosis.  (Tr. 330.)

Plaintiff saw Dr. Sleckman again on May 10, 2005, and reported pain in the muscles of the upper back.  (Tr. 322.)  On examination, Plaintiff was tender in the neck, upper and lower back, and lumbar spine.  (Id.)  She had good range of motion in the shoulders.  (Id.)  Dr. Sleckman recommended heat and massage to the painful muscles.  (Id.)

On July 27, 2005, Plaintiff saw Dr. Sleckman for muscle aches, neck and upper back

_____

[3]     Cyclobenzeprine is the generic form of Flexeril and is indicated for relief of muscle spasm.  PDR at 1930-31.

pain, and fatigue.  (Tr. 314.)  On examination, Plaintiff exhibited tenderness and spasm of the muscles of the neck and upper back.  (Id.)  Plaintiff said she had a little relief from taking cyclobenzaprine.  (Id.)

On October 15, 2005, Dr. Sleckman completed a Fibromyalgia Medical Evaluation Form for Plaintiff.  (Tr. 389-95.)  Dr. Sleckman indicated that he had seen Plaintiff three times in 2005.  (Tr. 389.)  He listed Plaintiff's impairments as depression, irritable bowel syndrome, chronic fatigue syndrome, TMJ syndrome, tension headaches, and hypothyroidism.  (Id.)  He also indicated Plaintiff met the American Rheumatological criteria for fibromyalgia.  (Id.)

Dr. Sleckman described Plaintiff's pain as constant and moderately severe.  (Tr. 391.)  He indicated Plaintiff was not a malingerer, but he was not sure whether emotional factors affected the severity of Plaintiff's symptoms.  (Id.)  Dr. Sleckman indicated Plaintiff would often experience pain sufficiently severe enough to interfere with her attention and concentration, and found her to be severely limited in dealing with work stress.  (Tr. 392.)  Dr. Sleckman listed Plaintiff's side effects from medication as drowsiness, dry mouth and fatigue.  (Id.)  He indicated that Plaintiff could sit, stand and walk for less than two hours at one time, and she would need to lie down at unpredictable intervals during a work shift.  (Tr. 393.)  He also opined that she could occasionally lift less than ten pounds, and would be absent from work about three times a month because of her impairments.  (Tr. 394-95.)  In describing Plaintiff's inability to work, Dr. Sleckman stated, "headaches and medications would interfere with patient's concentration.  Pain would interfere with ability to perform physical duties."  (Tr. 395.)

Plaintiff also saw Dr. Sleckman in follow up for fibromyalgia on October 26, 2005.  (Tr. 492.)  Plaintiff reported aching and stiffness in the joints.  (Id.)  On physical examination,

Plaintiff was tender in the neck, upper and lower back.  (Id.)  Plaintiff also saw Dr. Rohla that day and requested physical therapy.  (Tr. 494-95.)

On February 7, 2006, Plaintiff saw Dr. Sleckman for follow up regarding fibromyalgia.  (Tr. 480.)  Plaintiff reported continued muscle aching and pain in the right hip.  (Id.)  Plaintiff's hip had good range of motion, with negative straight leg raising test.  (Id.)  Plaintiff had both tenderness and spasm of the muscles of the neck, upper back, and superior gluteal folds.  (Id.)

Plaintiff's next follow up appointment was on August 14, 2006.  (Tr. 464-65.)  Dr. Sleckman noted that Plaintiff had developed moderate to severe limitation of movement in her left shoulder, for which she was going to therapy.  (Tr. 464.)  Plaintiff continued to have pain in the neck, upper and lower back.  (Id.)  Dr. Sleckman's impression was fibromyalgia and adhesive capsulitis[4] of the left shoulder.  (Id.)  He injected Plaintiff's left shoulder with lidocaine and Kenalog, which improved her pain and ability to move.  (Id.)  Dr. Sleckman warned Plaintiff that it could take a long time, months to a year, to recover from frozen shoulder.  (Id.)

Prior to her hearing before the ALJ, Plaintiff submitted to the SSA a Treating Physician Medical Opinion Statement form completed by Dr. Sleckman on February 9, 2008.  (Tr. 563-69.)  Dr. Sleckman indicated that Plaintiff's diagnoses were fibromyalgia, adhesive capsulitis of the left shoulder, depression, and chronic fatigue.  (Tr. 563.)  Dr. Sleckman opined that Plaintiff was limited to occasionally lifting and carrying less than ten pounds, standing or walking less than two hours in a workday, sitting less than six hours in a workday, with the need to alternate sitting and standing, limited to pushing and pulling less than ten pounds with her arms, and driving one

---

[4]        Adhesive capsulitis of the shoulder is condition in which there is a limitation of motion in a joint due to inflammatory thickening of the capsule, a common cause of stiffness in the shoulder.  Stedman's Medical Dictionary 282 (27th ed. 2000).

hour at a time for a total of two hours in a day. (Tr. 563-64.) Dr. Sleckman stated these limitations were based on Plaintiff's muscle spasms, tenderness, and limited movement of her left shoulder. (Tr. 564.)

Dr. Sleckman also indicated Plaintiff would have the following limitations: never climb, balance or crawl; occasionally kneel, crouch, stoop or reach; and environmental limitations from fibromyalgia. (Tr. 565-66.) These limitations were based on muscle spasm, limited movement of the left shoulder, pain in the arms, and poor reflexes induced by medication. (Tr. 565.) He further indicated Plaintiff's medications could make the operation of machinery hazardous. (Tr. 566.) Dr. Sleckman opined Plaintiff's depression markedly impaired her daily activities, social functioning, and concentration, persistence or pace. (Tr. 568.) He also opined that Plaintiff's headaches, anxiety, and asthma further impaired her ability to work, and moderately impaired Plaintiff's daily activities, social functioning, and concentration, persistence or pace. (Id.)

Dr. Sleckman completed a Medical Opinion form on July 3, 2007, opining that Plaintiff was limited to lifting and carrying less than ten pounds, no repetitive use of the arms, and no standing more than one hour at a time, two hours total in a day. (Tr. 571-72.) Then, Plaintiff saw Dr. Sleckman on January 31, 2008, and reported more pain in the left shoulder, poor sleep, poor energy, and hurting all over. (Tr. 570.) Upon examination, Plaintiff had decreased range of motion of the left shoulder, tenderness and muscle spasm in the neck, shoulders, and lumbar spine, and decreased grip strength. (Id.)

### Dr. Alberto Cabo Chan, Jr.

Plaintiff saw Dr. Alberto V. Cabo Chan, Jr., in endocrinology consultation on April 21, 2005. (Tr. 323-25.) Dr. Cabo Chan noted Plaintiff had been diagnosed as hypothyroid in the

past but had a violent reaction to the medication Cytomel, and was not taking any medication for hypothyroidism.  (Tr. 323.)  Plaintiff had lost ninety pounds, was fatigued and had recurrent headaches.  (Id.)  Plaintiff had abnormal thyroid function tests, but Dr. Cabo Chan noted some of Plaintiff's medications,  her depression, and bipolar disorder could cause her low TSH level.  (Tr. 325.)  He wanted to rule out a pituitary problem.  (Id.)

When Plaintiff saw Dr. Cabo Chan on May 23, 2005, he noted Plaintiff had gained fifteen pounds in two months.  (Tr. 318.)  Plaintiff complained of headache and cold intolerance.  (Id.)  On examination, Dr. Cabo Chan noted that Plaintiff appeared weak, and had a minimal tremor in her hands, which was chronic.  (Id.)  He also noted that Plaintiff's deep tendon reflexes were very sluggish.  (Id.)  Dr. Cabo Chan diagnosed hypothryroidism and prescribed Synthroid.  (Tr. 318-19.)

Plaintiff next saw Dr. Cabo Chan in follow up on July 27, 2005.  (Tr. 315-16.)  He noted Plaintiff had not done well on the generic medication for Synthroid, but was doing better after switching back to the name brand.  (Tr. 315.)  Her fatigue and cold intolerance had improved.  (Id.)  On September 20, 2005,  Dr. Cabo Chan started Plaintiff on combination therapy of Synthroid and Cytomel for hypothyroidism.  (Tr. 309-10.)

Plaintiff next saw Dr. Cabo Chan in follow up for hypothyroidism on December 13, 2005.  (Tr. 488-89.)  Plaintiff reported her lack of energy had not improved.  (Tr. 488.)  Dr. Cabo Chan discontinued Cytomel but continued Plaintiff on Synthroid.  (Tr. 489.)

On April 10, 2006, Plaintiff's symptoms were lightheadedness, episodes of near syncope, chronic fatigue of worsening severity, occasional headaches, and non-refreshing sleep.  (Tr. 476.)  Dr. Cabo Chan continued Plaintiff on Synthroid for low TSH.  (Tr. 477.)

### Dr. Bangalore Vijayalakshmi

On January 20, 2006, Plaintiff underwent a physical medicine and rehabilitation consultation with Dr. Bangalore Vijayalakshmi at Dakota Clinic. (Tr. 482-85.) Plaintiff's chief complaint was low back pain with right lower limb pain, and Dr. Vijayalakshmi wanted to rule out right lower limb neuropathy. (Tr. 482.) Plaintiff reported that her symptoms were intermittent but increasingly becoming constant. (Id.) Examination was essentially normal. (Tr. 483-84.) Dr. Vijayalakshmi diagnosed lumbar spine and lumbar facet joint degenerative disc disease, SI joint dysfunction, and idiopathic peripheral neuropathy. (Tr. 485.) An electrodiagnostic study did not show evidence of neuropathy or radiculopathy. (Id.)

### Mental Health Specialists

### Rape and Abuse Crisis Center

Records from the Rape and Abuse Crisis Center indicate that Plaintiff saw a counselor on November 18, 2004, and discussed a relationship that she was ending. (Tr. 387.) Plaintiff made two appointments with the same counselor in September and October 2005, but did not show up. (Id.)

### Dr. Ronald Odden

Plaintiff underwent a consultative psychological evaluation with Dr. Ronald Odden on March 27, 2006. (Tr. 424-26.) Dr. Odden reviewed Plaintiff's mental health history, noting she was first diagnosed with bipolar disorder more than twenty years ago. (Tr. 424.) He noted that Plaintiff had not experienced a manic episode the past year, but she reported hypomanic episodes once or twice a month, lasting three days, and otherwise depressed mood most days. (Id.) Dr. Odden noted that Plaintiff saw a psychiatrist, Dr. Block, and a counselor at the Rape and Abuse

Counseling Center.  (Id.)

Plaintiff described her daily functioning to Dr. Odden.  (Id.)  She typically woke up to get her sixteen-year-old son off to school, then would go back to bed until 1:00 p.m.  (Id.)  In the afternoon, she would get dressed and do light housework for 30-45 minutes.  (Id.)  She snacked rather than preparing meals.  (Id.)  She watched television, and would go to bed around 1:00 a.m. (Id.)  Plaintiff reported that she could sustain attention on tasks for 45-60 minutes.  (Id.)  She could drive and went grocery shopping twice a month.  (Tr. 425.)  Plaintiff spent time with her son and boyfriend, but reported that she felt others were critical of her, so she tended to keep to herself.  (Id.)  Dr. Odden noted that Plaintiff was pleasant and cooperative but tended to ramble frequently.  (Id.)

On mental status examination, Dr. Odden noted that Plaintiff appeared mildly hypomanic, and her thoughts appeared to be mildly racing.  (Id.)  Dr. Odden summarized his assessment:

> [Plaintiff] presented as an individual with a history of Bipolar I Disorder that currently is partially treated.  She shows some mixed mood symptoms at the current time, but does not show severe mood swings in recent months.  She has a number of physical health concerns that are being addressed by her physicians.  No evidence of hallucinations, delusions, obsessive thinking or paranoid ideation was found during this examination.  She also showed no evidence of an anxiety disorder being present.  Her overall prognosis for improvement is fair at this time.

(Tr. 426.)  Dr. Odden diagnosed Bipolar I Disorder, most recent episode mixed and moderate.

(Id.)  He assessed a GAF score of 53.[5]  (Id.)

_____

[5]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of

Plaintiff also supplemented her medical records with a Mental Residual Functional Capacity Questionnaire completed by Dr. Terry Block on January 28, 2008. (Tr. 532-36.) Dr. Block indicated he first saw Plaintiff in April 2004, and then saw her approximately every three to six weeks. (Tr. 532.) He indicated that her diagnoses were major depressive disorder, recurrent, generalized anxiety disorder, personality disorder NOS, and her current GAF score was 55, and the highest score was 60 in the last year. (Id.) He also indicated that Plaintiff's psychotropic medications were Nortriptyline, Wellbutrin, Lunesta and Xanax, which caused the side effect of drowsiness. (Id.) Dr. Block noted that Plaintiff's clinical findings were psychomotor slowing, marked fatigue, depressed mood, difficulty with concentration, loss of motivation, feelings of worthlessness and excessive worry. (Id.)

Dr. Block assessed Plaintiff's mental abilities to do unskilled work and concluded she would be unable to meet competitive standards in the following categories: maintain attention for a two-hour segment; maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal work stress. (Tr. 534.) Dr. Block noted that Plaintiff had very little physical, emotional or mental stamina. (Id.) He also indicated he did not believe Plaintiff's psychiatric condition exacerbated her pain or physical symptoms. (Tr. 535.) He anticipated that Plaintiff would miss

Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 51-60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).

more than four days work per month due to her impairments.  (Tr. 536.)  Dr. Block also completed a Psychiatric Review Technique Form, and indicated that Plaintiff met listing 12.04(C).  (Tr. 537-50.)

### State agency consultants

On May 9, 2006, a state agency consultant, Dr. Marlin Johnson, completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff.  (Tr. 428-35.)  He opined that Plaintiff could lift twenty pounds occasionally, ten pounds frequently, sit, stand or walk six hours in an eight-hour day, with no other physical limitations.  (Tr. 429-32.)  Another state agency consultant, Dr. Roger Larson, completed a Mental Residual Functional Capacity Assessment regarding Plaintiff.  (Tr. 436-39.)  Dr. Larson opined Plaintiff was moderately impaired in the following categories: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a persistent pace without an unreasonable number and length of rest periods.  (Tr. 436-37.)  Dr. Larson also completed a Psychiatric Review Technique Form, on which he indicated that Plaintiff had an affective disorder of bipolar syndrome under Listing 12.04, and that this resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 440-50.)

**TESTIMONY AT THE ADMINISTRATIVE HEARING**

Plaintiff testified to the following at the hearing before the ALJ.  Plaintiff was 49-years-

old, single, and lived alone in an apartment.  (Tr. 26.)  She had an eighteen-year-old son who no longer lived with her.  (Tr. 26-27.)  Plaintiff's highest education level was a two-year accounting degree from Moorhead Tech.  (Tr. 27.)  She last worked in May 2005, and had not looked for work since then.  (Tr. 30-31.)  Her last job was making sandwiches in a deli, and the job ended because it took her two or three days to recuperate from working four hours.  (Tr. 34.)  Plaintiff had also done work as a census taker, secretarial work, and she worked in a bakery owned by her mother in 1996-1999, but quit due to migraine headaches.  (Tr. 35-37.)

Plaintiff spent her time watching television, trying to do something around the house, and lying down.  (Tr. 38.)  She could groom herself, but did not always get dressed.  (Id.)  She cooked about four times a week, and washed dishes three times a week.  (Id.)  She no longer did crafts or sewing.  (Id.)  She did not do anything for fun.  (Tr. 40.)  She did not see her boyfriend, but she talked to him on the phone most days.  (Id.)  She went to the grocery store twice a month.  (Id.)    Plaintiff had a son and grandchildren who lived in Minot, and she took a train there to see them for Christmas.  (Tr. 43.)  She stayed for three weeks.  (Id.)  She made this trip two or three times in the last three years, sometimes by train, and sometimes someone gave her a ride.  (Tr. 43-44.)  She drove herself to Minot once the previous summer, and got a ride back.  (Tr. 44.)  The drive was five and a half hours long, and she had to stop and stretch.  (Id.)  She also visited Hillsboro once every three to four months to see friends.  (Tr. 55.)

Plaintiff testified as to having the following limitations:  trouble concentrating, spelling, holding objects like a pencil, lack of strength for standing and lifting, trouble sleeping due to discomfort, trouble bending, and following through with things due to headaches.  (Tr. 27-30, 45.)  Plaintiff listed her medications, and told the ALJ that she was not addicted to narcotics.

22

(Tr. 31-34.)  Plaintiff testified that her physical problems were worse now then in September 2004, because she had a frozen shoulder with limited movement.  (Tr. 50-51.)  Plaintiff's pain is constant in the neck, shoulders, hips, and legs, and she rated her pain, on a daily basis, at a level of five to seven on a scale of one to ten.  (Tr. 52.)  Plaintiff also had daily tension headaches that sometimes developed into migraine headaches.  (Tr. 56.)

A vocational expert, Warren Higginson, also testified at the administrative hearing.  (Tr. 37, 57-64).  The ALJ asked the vocational expert whether an individual of Plaintiff's age, educational background and work history, whose impairments and limitations were as Plaintiff testified, could perform Plaintiff's past relevant work.  (Tr. 59.)  The VE testified that such a person could not  maintain any full-time competitive work.  (Tr. 60.)

The ALJ asked a second hypothetical question assuming the same age, educational background, work history and impairments but with the physical and mental limitations indicated in Exhibits B13F and B14F [the state agency consultants' RFC assessments].  (Tr. 60.) The VE testified that such a person could perform Plaintiff's past relevant work as a census taker and a sandwich maker.  (Tr. 60-61.)  The VE further testified that work would be possible as a motel cleaner, parking lot attendant, assembling eyeglass frames, lens inserter, and other light assembly.  (Tr. 61-62.)

The VE had not seen the medical opinion forms Plaintiff's attorney had submitted with his brief, and could not testify as to such.  (Tr. 62.)  The ALJ stated, "[a]nd I think from my examination of the doctors' opinions, even an ALJ could concede that the person probably could not work."  (Tr. 62.)  The VE also testified that missing two days per month is the maximum any employer would tolerate in competitive employment.  (Tr. 63.)

**THE ALJ'S DECISION**

On May 21, 2008, the ALJ issued his decision denying Plaintiff's application for disability insurance benefits. (Tr. 5-20.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. § 416.920(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant has not engaged in substantial gainful activity since August 16, 2005, the application date. (Tr. 10.) At the second step of the process, the ALJ found that Plaintiff had severe impairments of fibromyalgia syndrome, headaches, adhesive capsulitis of the left shoulder, and affective disorder. (Id.)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix One. (Tr. 11.) Specifically, the ALJ

found Plaintiff did not have a dysfunction of two upper extremity joints resulting in an inability to perform fine or gross movements to meet or equal Listing 1.02. (Id.) The ALJ then considered Plaintiff's affective disorder and found Plaintiff established the "paragraph A" criteria of Listing 12.04. (Id.) The ALJ considered the "paragraph B" criteria, which requires that the mental impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Id.) The ALJ found Plaintiff to have mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence or pace. (Id.) The ALJ also found that Plaintiff did not experience any episodes of decompensation and their was no evidence of the "paragraph C" criteria of the listings. (Id.) Thus, Plaintiff did not meet or equal Listing 12.04.

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform light work, restricted to simple, unskilled work. (Tr. 12.) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform her past relevant work, but could perform other work that exists in substantial numbers in the national economy including motel cleaner and parking lot attendant. (Tr. 18-19.) Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security act, since August 16, 2005. (Tr. 19-20).

**DISCUSSION**

### Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is

supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." <u>Id.</u>

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. <u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994); <u>see</u> <u>also</u> <u>Woolf</u>, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Gavin</u>, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. <u>See</u> 20 C.F.R. § 404.1512(a); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she can not perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. <u>Martonik v. Heckler</u>, 773 F.2d 236, 239 (8th Cir. 1985).

**<u>The ALJ did not fail to develop the record</u>**

Plaintiff asserts the ALJ failed to fully and fairly develop the record because he dismissed Plaintiff's statements that she sought extensive medical treatment in 2007, and rather than obtaining the records, found that "the claimant appears to have undergone no medical treatment between August 2006 and January 2008." (Plaintiff's Memorandum in Support of Motion for Summary Judgment at 19 ("Pl.'s Mem.") (citing Tr. 16.)) Plaintiff further contends the ALJ erred by failing to obtain the records of Dr. Block, Plaintiff's psychiatrist, instead finding "there is little evidence in the file indicating the claimant has participated in formal mental health care." (Pl.'s Mem. at 19) (citing Tr. 14.))

Defendant contends remand is not required to obtain records from Dr. Block. Defendant states that Plaintiff was represented by counsel, and Plaintiff signed a release on February 16, 2007, for Dr. Block's medical records "from January 4, 2005 to the present." Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 27 (citing Tr. 573.)) Because the records were not submitted, Defendant asserts Plaintiff's failure to submit the records permits an inference that the records would not support her claim. Defendant cites Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1994) for the proposition that because Plaintiff was represented by counsel, and counsel did not obtain the records, the documents were of minor importance, and remand was not required. (Def.'s Mem. at 28.) Furthermore, Defendant asserts Plaintiff has not established that she would be unfairly prejudiced by the omission of the records.

In response, Plaintiff cites Snead v. Barnhart, 360 F.3d 834 (8th Cir. 2004) for the proposition that the ALJ has a duty to fully develop the record even when the claimant is represented by counsel, if the evidence may have altered the outcome of the disability determination. Plaintiff asserts that because the ALJ discounted Dr. Block's disability opinion

because his treatment records were not in the administrative record, the outcome may have been different if the ALJ had examined Dr. Block's treating records. Plaintiff contends that because Dr. Block treated Plaintiff on a regular basis over several years, his opinion is entitled to at least great weight.

The ALJ has a responsibility to develop the record fairly and fully, independent of the claimant's burden to present his case. Nevland v. Apfel, 204 F.3d 853, 858 (2000). In Shannon v. Chater, the court stated:

> Although the ALJ has a duty to develop the record despite the claimant's representation by counsel, the fact that Shannon's counsel did not obtain (or, as far as we know try to obtain) the items Shannon now complains of suggests that these alleged treatments have only minor importance.

54 F.3d at 488. The court went on to state that reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial. Id. In Shannon, the court noted that it was unclear what was in the missing records that "should be regarded as dispositive" for the Plaintiff's claim. Id.

Plaintiff asserts that if Dr. Block's records were obtained, they could change the outcome of the case. In other words, they might support Dr. Block's disability opinion, which was submitted in a fibromyalgia questionnaire dated January 28, 2008. However, like in Shannon, Plaintiff has not revealed anything of the substance of Dr. Block's treatment records to indicate the records would change the outcome of the case. The fact that Dr. Block noted Plaintiff's highest GAF score within the last year was 60 (Tr. 532), where a score of 61 indicates only mild limitations from mental impairments, it seems unlikely the records would change the outcome of the case.

Additionally, the ALJ gave minimal weight to Drs. Rohla, Sleckman, and Turner's opinions on Plaintiff's physical RFC in part because there were few if any records of treatment for seventeen months prior to January 2008. (Tr. 17-18.) Again, Plaintiff has not asserted anything of substance to indicate that her treatment records from 2007 would change the outcome of the case.

The Court also notes that at the hearing, where Plaintiff was represented by counsel, the ALJ asked whether there was any other evidence out there "that we don't have that we should." (Tr. 64.) Plaintiff's counsel responded, "I don't believe so, just the additional attachments to our briefs. . ." (Id.) One of the attachments to the brief was a three page document of "Claimant's Recent Medical Treatment," which included visits to Dr. Block, Dr. Rohla, Dr. Sleckman, Dr. Turner, Dr. Kramer and others. (Tr. 558-60.) After receiving the ALJ's decision, which commented on the lack of treatment records for the year 2007, Plaintiff could have submitted additional medical records to the Appeals Council, see 20 C.F.R. 416.1476(b)(1), but did not do so. (Tr. 118-23.) Under the circumstances it is reasonable to conclude, as in Shannon, that the documents were of little importance to Plaintiff's claim. Therefore, Plaintiff has not shown that it is necessary to remand to obtain the medical records that were not submitted into the record.

**The ALJ did not err by finding hypothyroidism, irritable bowel syndrome, and TMJ dysfuntion nonsevere impairments**

Plaintiff contends the ALJ erred by considering hypothyroidism, irritable bowel syndrome, and TMJ singly rather than in combination when assessing Plaintiff's severe impairments. Specifically, Plaintiff asserts the ALJ should have considered the combined effect of these impairments on Plaintiff's fibromyalgia. Defendant contends remand is unnecessary

because if the ALJ finds *any* severe impairment, the evaluation process proceeds, and the ALJ must take into account all of Plaintiff's impairments, both severe and nonsevere, in determining Plaintiff's residual functional capacity. Defendant is correct. See 20 C.F.R. 416.945(a)(2).

Furthermore, Plaintiff has not asserted what additional limitations were imposed by her hypothyroidism, irritable bowel, and TMJ but were not incorporated into the RFC. The record indicates that Plaintiff's hypothyroidism, with the most severe symptom being weight loss, came under control after the short period when Plaintiff was over medicated with Cytomel. (Tr. 340-41.) Although Plaintiff complained of chronic constipation, nothing in the record suggests any functional limitations resulting from irritable bowel syndrome. As to TMJ, Plaintiff had a history of two surgeries before the relevant time period, but otherwise only once complained of jaw pain. Therefore, the ALJ did not err by failing to impose additional functional limitations based on Plaintiff's impairments of hypothyroidism, IBS, and TMJ. See Hilkemeyer v. Barnhart, 380 F.3d 441, 447 (8th Cir. 2004) (ALJ's decision not to incorporate additional limitation in RFC was proper because record did not support limitations from nonsevere impairment).

### The ALJ properly weighed the medical opinions

Plaintiff asserts the opinions of four treating sources are well-supported and consistent with each other in concluding Plaintiff is incapable of sedentary work due to her limitations. First, Plaintiff contends Dr. Rohla's opinion is consistent with his findings of typical trigger points of fibromyalgia and fibromyositis. Second, Plaintiff contends Dr. Sleckman, who is a rheumatologist, repeatedly diagnosed Plaintiff with fibromyalgia and pain; therefore, his opinion should be given more weight as a specialist. Third, Plaintiff asserts Dr. Turner's opinion is

entitled to more weight because he treated Plaintiff regularly since 2001 for "constant neck, mid back and low back pain," and Dr. Turner stated that Plaintiff met the American Rheumatological criteria for fibromyalgia. ( Pl.'s Mem. at 13). Additionally, Dr. Turner's opinion was based on a bone scan and X-rays indicating degenerative disease. (Id. (citing Tr. 300.)) Fourth, Plaintiff contends the ALJ erred by ignoring Dr. Block's opinion. Plaintiff contends Dr. Block's opinion is entitled to controlling weight because he treated Plaintiff every three to six weeks since April 2004, and he diagnosed Plaintiff's mental impairments using an acceptable diagnostic technique, the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.

Furthermore, Plaintiff asserts the reasons the ALJ gave for granting more weight to the opinions of the nonexamining state agency consultants were speculative. Plaintiff cites the ALJ's statements that "a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another" and "patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians." (Pl.'s Mem. at 15 (citing Tr. 18).) Plaintiff asserts these are not good reasons for dismissing four treating physicians' opinions.

Defendant replies that the ALJ properly discounted Plaintiff's treating physicians' opinions as inconsistent with the objective evidence and Plaintiff's daily activities. Defendant asserts the record indicates Plaintiff's fibromyalgia and headaches had improved by the end of 2005, and Plaintiff engaged in activities including personal needs, driving, housework, caring for her son, caring for a ferret, and taking trips to other towns by train and car. Defendant also notes the ALJ found the physicians' opinions appeared to be based primarily on Plaintiff's subjective complaints.

Defendant also argues that the record does not support Dr. Block's opinion that Plaintiff met Listing 12.04(C)(2). In support of this argument, Defendant states that Plaintiff's activities of attending doctor's appointments, shopping, and taking trips out of town without significant deterioration in her condition is inconsistent with someone who cannot tolerate even a minimal increase in mental demands or change in the environment. Defendant also contends Dr. Block's GAF score assessment of 55-60 is inconsistent with his own opinion, and the opinion of Dr. Odden was also inconsistent with disability. In Reply, Plaintiff contends that even if the ALJ did not grant controlling weight to the physicians' opinions, nearly every factor that should be considered in weighing the medical opinions under 20 C.F.R. § 404.1527(d) [see also 416.927(d)] favors granting more weight to her treating physicians' opinions, especially Dr. Sleckman, a specialist in fibromyalgia.

The Court agrees that the ALJ had no evidence from which to conclude Plaintiff's physicians provided their opinions out of sympathy for or simply at the demands of Plaintiff. Nevertheless, an ALJ can discount a treating physician's opinion "when that opinion conflicts with other substantial medical evidence contained within the record" or if the opinion is "inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849-50 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000) and Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007)).

The fact that Plaintiff's treating physicians' found objective evidence to support a diagnosis of fibromyalgia does not mean the ALJ must accept the physicians' opinions of Plaintiff's physical limitations. While Plaintiff's objective findings support the diagnosis of fibromyalgia, they do not necessarily support the severity of Plaintiff's subjective complaints of

pain, fatigue, and loss of concentration.  See <u>Tennant v. Apfel</u>, 224 F.3d 869, 870 (8th Cir. 2000)

(noting that although fibromyalgia can cause joint pain and fatigue, the issue was the severity of

the plaintiff's fibromyalgia-related symptoms).

All of Plaintiff's treating physicians' opinions were provided in a "check the box" type

form, although they included some narrative response.  The Eighth Circuit has stated:

> We have upheld an ALJ's decision to discount a treating
> physician's MSS[6] where the limitations listed on the form "stand
> alone," and were "never mentioned in [the physician's] numerous
> records or treatment" nor supported by "any objective testing or
> reasoning."  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.
> 2001); *see also Strongson [v. Barnhart,]* 361 F.3d [1066], 1071
> [8th Cir. 2004].

<u>Reed v. Barnhart</u>, 399 F.3d 917, 921 (8th Cir. 2005).

None of Plaintiff's treating physicians gave her any work restrictions in the course of

evaluating and treating her, although she did complain of pain and fatigue.  "The lack of physical

restrictions militates against a finding of total disability."  <u>Hutton v. Apfel</u>, 175 F.3d 651, 655

(8th Cir. 1995) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993).  The physical

limitations proposed by Drs. Rohla, Turner and Sleckman were not supported by the objective

findings, which overall suggest only moderate symptoms, improving over time.  For example,

although Dr. Rohla concluded that Plaintiff was disabled on August 15, 2005, he rated her pain

and fatigue as moderate.  (Tr. 294).  Even a month before Dr. Rohla gave his first opinion,

Plaintiff was noted to have some relief to her fatigue from taking cyclobenzaprine.  (Tr. 314.)

Then, a month after Dr. Rohla gave his opinion, he noted that Plaintiff's fibromyalgia had

improved, and she was stable and doing well on her current medications.  (Tr. 309.)  In January

---

[6]     MSS stands for medical source statement.  <u>See Leckenby v. Astrue</u>, 487 F.3d 626,
628 (8th Cir. 2007).

2005, examination of Plaintiff's extremities revealed normal mass, strength, tone and range of movement. (Tr. 340.) On October 26, 2005, Dr. Rohla noted he was the fifth doctor Plaintiff had seen that day, but she reported feeling well with no complaints. (Tr. 494). Dr. Fitzgerald noted that Plaintiff's headaches improved after she began using Inderal as a prophylactic medication. (Tr. 326, 346, 407.) In his latest medical record of October 2005, Dr. Fitzgerald contemplated weaning Plaintiff off Topamax or Inderal if she continued without headaches. (Tr. 490).

Dr. Turner opined in August 2005, that Plaintiff would have restrictions of sitting for four hours, standing or walking less than two hours at a time, lifting twenty pounds occasionally, and that she would need to lie down at unpredictable times during a work shift. (Tr. 303.) He had not previously given Plaintiff these restrictions, and his objective findings do not explain how he came to these conclusions. Dr. Turner's objective findings of Plaintiff's neck and back pain were mild to moderate at most, including trigger point tenderness, muscle tightness, and at times, some reduced range of motion of the cervical or lumbar spine, which he generally treated with manipulation.

Plaintiff saw her rheumatologist, Dr. Sleckman, only three times before he gave his first opinion of disability. On those three occasions, the objective evidence of Plaintiff's complaints included mild pain with movement of the hips, tenderness and spasm in the muscles of the neck, upper and lower back. (Tr. 314, 322, 330). These conditions, when treated, suggest only mild to moderate impairments at most. Later, in August 2006, Dr. Sleckman noted that Plaintiff had moderate to severe limitation of movement of the left shoulder, which he diagnosed as adhesive capsulitis of the left shoulder. (Tr. 464.) Again, Plaintiff had some relief with treatment. (Id.)

34

The next medical record from Dr. Sleckman was January 2008, where he noted Plaintiff had pain with movement of the neck and left shoulder, limited range of motion of the left shoulder, and decreased grip strength. (Tr. 570.) Dr. Sleckman's second disability opinion, dated February 9, 2008, limited Plaintiff to occasionally lifting and carrying less than ten pounds, standing or walking less than two hours in a workday, sitting less than six hours in a workday, with the need to alternate sitting and standing, limited to pushing and pulling less than ten pounds with her arms, and driving one hour at a time for a total of two hours in a day. (Tr. 563-64.) The objective findings simply do not support these extreme limitations. As the ALJ stated, the physicians' limitations appear to be based on Plaintiff's subjective complaints. Where a treating physician's opinion as to Plaintiff's physical limitations is based largely on Plaintiff's subjective complaints, with little objective medical support, and inconsistent with the whole record, the ALJ may discount the treating physician's opinion. Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005). The state agency consultant's opinion regarding Plaintiff's physical limitation to light work was more consistent with the record of primarily moderate and improving symptoms of pain and fatigue. Furthermore, the ALJ's decision was not based solely on the lack of objective findings. As discussed below, substantial evidence supports the ALJ's finding that Plaintiff's testimony as to the severity of her symptoms was not entirely credible.

With respect to Plaintiff's mental impairments, there is very little evidence in the treatment records to support the physicians' opinions that Plaintiff's concentration is significantly impaired. Dr. Rohla opined that Plaintiff was "drugged up" and "spaced out" from taking too many pain medications, but there is no evidence during the relevant time frame, August 2005 through the date of the ALJ's decision, of Plaintiff complaining of such side

effects.  None of Plaintiff's mental status examinations with her treating physicians indicated a lack of concentration.  Dr. Odden, the consultative examiner, noted that Plaintiff's thoughts were mildly racing, her attention span was average, but she had some difficulty staying on tasks more than sixty minutes at a time.  Therefore, he limited Plaintiff to tasks with three steps.  The state agency psychological consultant, Dr. Roger Larson, agreed with this limitation, and the ALJ included it in his RFC finding by restricting Plaintiff to simple, unskilled work.  The ALJ's finding properly reflects the evidence regarding Plaintiff's concentration deficit.

Third, the evidence does not support Dr. Block's opinion that Plaintiff's mental impairments are disabling.  As discussed previously, Dr. Block's treatment records are not in the administrative record, although Plaintiff had the opportunity to submit them for the ALJ's or Appeal Council's consideration.  Nonetheless, Dr. Block submitted a questionnaire he completed in 2008, which indicated Plaintiff was disabled by her mental impairments of major depressive disorder, recurrent, generalized anxiety disorder, personality disorder, and that she met Listing 12.04(C).  The reasons Dr. Block gave for his opinion were clinical findings of psychomotor slowing, marked fatigue, depressed mood, difficulty with concentration, loss of motivation, feelings of worthlessness and excessive worry.  Although Plaintiff reported some of these symptoms occasionally to her treating physicians, the record as a whole does not support that these symptoms were as limiting as Dr. Block concluded.  As discussed above, Plaintiff's fatigue was moderate and improving, and her lack of concentration for more than sixty minutes at a time would not preclude simple, unskilled work.  Additionally, the treatment records generally do not contain any symptoms of anxiety other than Plaintiff occasionally stating she was under stress, and Plaintiff also denied anxiety on occasions.  See Tr. 288, 309, 340, 483.

Furthermore, the ALJ noted that the GAF scores Dr. Block assigned to Plaintiff, 55-60, indicated only moderate limitations from her mental impairments. Dr. Odden assigned Plaintiff a similar GAF score of 53, and opined that Plaintiff was not precluded from employment by her mental impairments. An ALJ may use GAF scores for assistance in assessing the level of a claimant's functioning. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010).

Dr. Block's opinion that Plaintiff met Listing 12.04(C) is also not consistent with his GAF scores or the record as a whole. Listing 12.04(C) requires evidence of one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. 404, Subpart P, Appendix 1, 12.04(C). There is no evidence in the record of episodes of decompensation of extended duration, no suggestion that any minimal increase in mental demands or change of environment would cause decompensation, or any history of the need for a highly supportive living arrangement. Furthermore, Dr. Block did not provide any reasoning for finding that Plaintiff met this Listing 12.04(c).

In summary, Dr. Block's opinion was not consistent with the record as a whole. Therefore, the ALJ did not err in rejecting Dr. Block's opinion, and accepting the opinion of the state agency consultant, who agreed with Dr. Odden's mental limitation to three step tasks.

**The ALJ did not fail to evaluate Plaintiff's subjective complaints under the Polaski standard**

Plaintiff asserts the ALJ evaluated Plaintiff's subjective complaints under an improper standard assessing credibility "based on a consideration of the entire case record." (Pl.'s Mem. at 21-22 (citing Tr. 12.)) Plaintiff contends that by applying this broad standard, the ALJ makes only a cursory analysis of Plaintiff's pain and fatigue without addressing such things as duration, frequency and intensity of pain, and dosage, effectiveness, and side effects of medication, which support Plaintiff's credibility.

Defendant contends the ALJ explicitly set forth the sequence for evaluating credibility in accordance with Social Security Ruling 96-7p and controlling Eighth Circuit case law. Defendant further contends an ALJ may find a claimant not credible by citing inconsistencies in the record, including Plaintiff's daily activities. Defendant also notes the ALJ is not required to discuss each credibility factor, if the ALJ acknowledged and considered those factors.

In Response, Plaintiff asserts the ALJ did not in fact follow the Polaski analysis, and failed to acknowledge and consider Plaintiff's subjective complaints under the proper legal standard. Plaintiff also asserts the objective medical evidence and Plaintiff's daily activities are not inconsistent with her claims of total disability.

The Court rejects Plaintiff's argument that the ALJ did not follow the proper legal standard in evaluating the credibility of her subjective complaints. The ALJ set forth the correct regulation governing the credibility analysis, 20 C.F.R. § 416.929, and is not required to discuss each factor in the credibility analysis. Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006).

The ALJ found Plaintiff not entirely credible based on mild to moderate objective findings in the record, and because Plaintiff's daily activities are not consistent with the severity of her subjective complaints. The ALJ specifically cited to Plaintiff's abilities to care for herself,

her son, and a ferret, to do some housework and grocery shopping, and to drive or take a train fairly long distances to visit family and friends. In addition to these findings by the ALJ, most significantly the ability to travel fairly long distances, the Court finds additional evidence in the record suggesting Plaintiff is not as severely limited as she testified. This includes evidence that Plaintiff engaged in activities such as packing and moving boxes, climbing up and down a ladder, and cleaning out a fish house. See Tr. 289, 398, 353. Although Plaintiff's use of strong pain medications generally would support her credibility, Dr. Fitzgerald noted that if Plaintiff continued her use of short acting narcotic analgesics, should would not get rid of her daily headaches, and noted that Plaintiff had a problem with analgesic overuse in the past. (Tr. 326, 347). This actually cuts against the credibility of Plaintiff's subjective complaints. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) ("[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations.") Thus, there is substantial evidence in the record to support the ALJ's credibility analysis. See Wagner, 499 F.3d at 852 (listing cases where court deferred to ALJ's credibility determinations, based in part on claimant's daily activities).

**The hypothetical question posed to the Vocational Expert included all of Plaintiff's physical and mental limitations**

"[T]he Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to meet her burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform." Sultan v. Barnhart, 368 F.3d 857, 864 (8th Cir. 2004) (citing 20 C.F.R. § 416.966(e); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997)). "A hypothetical question is properly formulated if it sets forth

impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  As discussed above, there is substantial evidence in the record to support the ALJ's decision to adopt the mental and physical RFC opinions of the state agency consultants.  The ALJ asked the vocational expert to assume the hypothetical person had the limitations set forth in the exhibits containing the state agency consultants' opinions.  (Tr. 60.) Therefore, the ALJ properly relied on the vocational expert's testimony that there are jobs that exist in significant numbers that Plaintiff could perform.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment be denied [Docket No. 24], and the case be remanded pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this Report and Recommendation;

2.    Defendant's Motion for Summary Judgment [Docket No. 27] be granted;

3.    Judgment be entered accordingly.

Dated: September 20, 2010                    s/Arthur J. Boylan
                                                        ARTHUR J. BOYLAN
                                                        United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before October 4, 2010.